1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TANYA GILL,                          )
                                     )
                Plaintiff,           )
     vs.                             )  Case No. 12-CV-2963
                                     )
VILLAGE OF MELROSE PARK, a           )
Municipal Corporation, et al.,       )
                                     )
                Defendants.          )

        Deposition of TANYA GILL called as a witness

herein, pursuant to the applicable provisions of the

Federal Rules of Civil Procedure for the State of

Illinois, before Belinda A. Harr, CSR No. 84-003215,

taken on October 8, 2012, at 10:00 a.m. at 333 W.

Pierce Road, Itasca, Illinois.



1     A.     Prior to the Chicago address.

2     Q.     Okay.  For how long?

3     A.     For three years.

4     Q.     So you were living in Calumet City on

5  April 4th of 2011?

6     A.     Yes.

7     Q.     April 2nd, 2011, I should say.  Is that

8  correct?

9     A.     Yes.

10     Q.     Did you live there with anybody else at

11  that time?

12     A.     No.

13     Q.     What is the highest level of education

14  you've completed?

15     A.     College.

16     Q.     And where did you complete college?

17     A.     Illinois State.  Well, no.  How about I

18  had some college --

19     Q.     Oh, okay.

20     A.     -- at Illinois State University, and then

21  Chubb Institute was where I completed it.

22     Q.     Okay.  I'm sorry.  What's that --

23     A.     Chubb Institute.

1    alone though.

2          Q.    Okay.  The colleagues that you were with

3    at the game, did they come with you to the iBar

4    afterwards?

5          A.    No.

6          Q.    While you were at the Bulls game, did you

7    have any alcoholic drinks?

8          A.    Yes.

9          Q.    How many alcoholic drinks?

10          A.    Two glasses of red wine.

11          Q.    Apart from going to the Bulls game did

12    you do anything else like go to dinner with the

13    colleagues or with anybody else?

14          A.    No.

15          Q.    Did you go to the iBar straight after the

16    Bulls game?

17          A.    No.

18          Q.    Where did you go after the Bulls game?

19          A.    Home.

20          Q.    And how long were you at home?

21          A.    Maybe an hour and a half, or so.

22          Q.    And when you left your home, where did

23    you go?

1       A.    To the iBar.

2       Q.    Do you, approximately, remember what time

3 that was?  Or strike that.  Do you remember

4 approximately what time that was that you went to the

5 iBar?

6       A.    What time I arrived at the iBar?

7       Q.    Sure.

8       A.    About -- arriving there, about 11:25, or

9 so.

10      Q.    When you went to the iBar from your home,

11 did you go with anybody?

12      A.    Tanya Frizell.

13      Q.    Now, while you were at -- the

14 approximately hour and a half you were at home, did you

15 have any alcoholic beverages?

16      A.    No.

17      Q.    Was Ms. Frizell with you while you were

18 at home for that hour and a half?

19      A.    No.

20      Q.    Was she there for a portion of the time?

21      A.    Yes.

22      Q.    Did she come just so that the two of you

23 could go to the iBar together?

1     Q.    What was the first thing that happened

2   when you got to the iBar on April 2nd?

3     A.    My purse was searched at the door.

4     Q.    Okay.  How about once you got inside?

5     A.    We had to show our ID and pay.

6     Q.    Okay.  There was a cover charge?

7     A.    Yes.

8     Q.    And then did you go to the bar?

9     A.    We went in and went to the bar, yes.

10    Q.    Okay.  Did you order a drink?

11    A.    Yes.

12    Q.    When you say we, is that you and

13  Ms. Frizell?

14    A.    Yes.

15    Q.    Okay.  Did you and Ms. Frizell order a

16  drink?

17    A.    She ordered her own drink.  I ordered

18  mine.

19    Q.    Okay.  What happened after you ordered

20  the drinks?

21    A.    We were talking.

22    Q.    Okay.  Were you sitting at the bar or

23  were you standing?

1   A. Standing.

2   Q. Were you standing near the bar?

3   A. Yes.

4   Q. Were you and Ms. Frizell talking or were

5 you talking to somebody else?

6   A. Me and Frizell was talking.

7   Q. Did you eventually get your drink?

8   A. Yes.

9   Q. After you got your drink did you continue

10 to stand near the bar?

11   A. Yes.

12   Q. At any point prior to the assault

13 allegation, were you sitting at the bar?

14   A. No.

15   Q. Okay.  So you remained standing the whole

16 time?

17   A. Yes.

18   Q. What about Ms. Frizell; was she standing

19 with you the whole time?

20   A. No, she was sitting.

21   Q. Was she sitting up against the bar?

22   A. Yes.

23   Q. Okay.  Now, at some point you allege that

1    forth.  I just -- she just turned around and punched

2    me.

3         Q.    This may sound a bit weird.  I know you

4    just said that you saw lights, but before that did you

5    see her coming at you?

6         A.    No.

7         Q.    So you don't know if this woman stood up

8    from her stool or anything like that --

9         A.    No.

10        Q.    -- before punching you?  You're a pretty

11   tall woman; is that correct?

12        A.    Yes.

13        Q.    How tall are you?

14        A.    Six feet.

15        Q.    What happened after you saw the stars?

16   Did you fall to the ground or --

17        A.    No.

18        Q.    -- did you --

19        A.    I staggered back.  And Frizell came in

20   between us.

21        Q.    Do you recall this other patron saying

22   anything to you when she punched you?

23        A.    No.

1        Q.    Did she say anything to you immediately

2  after punching you?

3        A.    Not immediately after punching me.

4        Q.    Okay.  Did she say anything to you

5  sometime after punching you?

6        A.    Yes.

7        Q.    What did she say?

8        A.    That she was sorry.  Only after Frizell

9  said that she was calling the police.

10       Q.    Okay.  That was going to be my next

11  question.

12       A.    Okay.

13       Q.    So Ms. Frizell came in between the two of

14  you, correct?

15       A.    Yes.

16       Q.    And did she say anything to this other

17  patron?

18       A.    Yes.

19       Q.    And what did she say?

20       A.    Bitch, I'm calling the police.

21       Q.    Did Ms. Frizell call the police?

22       A.    Yes.

23       Q.    She used her cell phone?

1    A.    A couple of minutes.

2    Q.    And did they come inside the iBar?

3    A.    When I saw the flashing lights, Frizell

4  told me to go outside and meet the police, that she was

5  going to stay there to make sure that she wouldn't

6  leave, the other lady.  So I went out to go get the

7  police, and as I was going out they were coming in, and

8  I was telling them that I had just been hit by a woman,

9  and the officer told me to step outside.

10   Q.    As you were walking out you said police

11  were coming in?

12   A.    Yes.

13   Q.    Do you recall, approximately, how many

14  officers were walking in?

15   A.    I believe there were two.

16   Q.    And it was one of those officers that

17  asked you to come outside?

18   A.    Yes.

19   Q.    Do you know the names of either of those

20  officers?

21   A.    No.

22   Q.    Okay.  Can you try to visually describe

23  what the two officers looked like that you had met at

1    the door?

2         A.    No.

3         Q.    The officer that's sitting here with us

4    today, does he look familiar as one of those two

5    officers?

6         A.    One of the two officers that initially

7    came in?  No.

8         Q.    Okay.  Okay.  And when the officers asked

9    you to come outside, did you come outside?

10        A.    Yes.

11        Q.    And where -- strike that.  Did you come

12   just outside of the door of the iBar?

13        A.    No.

14        Q.    Okay.  Where did you go?

15        A.    There was -- right outside the door there

16   was a walkway, and it ended and made a turn at the end

17   of the building.  So we were on the walkway but at the

18   end of the building.

19        Q.    And you were with these two police

20   officers?

21        A.    By this time there was more than two.

22        Q.    Okay.  Approximately, how many additional

23   officers came on the scene apart from these two?

1        A.     I think four additional.

2        Q.     When you came out to speak with the

3   officers, did Ms. Frizell come out as well?

4        A.     Yes.

5        Q.     Okay.  Did anyone else come out with the

6   two of you?

7        A.     She came out with the -- she came out

8   ahead of the lady and her companion.

9        Q.     Okay.  So Ms. Frizell walked out with the

10  patron who had hit you and her friend?

11       A.     Yes.

12       Q.     Okay.  And did she come out with you or

13  sometime after you?

14       A.     Seconds after me.

15       Q.     Did Mr. Dixon come out as well?

16       A.     He came out right after like with us --

17  like all this happened in a matter of minutes, so it's

18  like seconds apart.  So no time.  Seconds.

19       Q.     I'm just trying to --

20       A.     Okay.

21       Q.     -- set the scene.  I'm not trying to

22  confuse you or -- you know, I'm just trying to set the

23  scene so that we can tell what happened.

1        A.      Okay.

2        Q.      So just seconds after you walked out

3    Ms. Frizell walked out with the patron of the bar who

4    had hit you and her companion, correct?

5        A.      And Dixon.

6        Q.      And then Mr. Dixon also came out?

7        A.      Uh-huh.

8        Q.      Yes?

9        A.      Yes.

10       Q.      Did Mr. Allen ever step outside of the

11   iBar?

12       A.      No.

13       Q.      And Ms. Frizell and Mr. Dixon, did they

14   walk over --

15       A.      Yes.

16       Q.      -- to where you were standing with the

17   police officers?

18       A.      Yes.

19       MR. HUNDLEY:  Let her finish.

20   BY MS. RUKAVINA:

21       Q.      Apart from you, Ms. Frizell, Mr. Dixon,

22   the patron who hit you, her companion, and the police

23   officers, were there other people outside of the iBar

1    at that time?

2              A.    Yes.

3              Q.    Did you recognize any of those people?

4              A.    No.

5              Q.    As you sit here today do you have any

6    knowledge of who those people are?

7              A.    No.

8              Q.    Did you have any conversation with any

9    one of the officers that arrived at the scene?

10             A.    Yes.

11             Q.    Okay.  Did you have a conversation with

12   one officer or more than one?

13             A.    More than one.

14             Q.    Tell me -- the first officer that you

15   spoke with, would you be able to describe what he looks

16   like?

17             A.    The first one was one of the officers

18   that initially came in, but that's not the officer that

19   was asking me the questions.

20             Q.    Okay.  The conversation that you had with

21   one of the two original officers that came, what

22   conversation did you have with him?

23             A.    Just for them to tell me to come outside.

1          A.    He was about 5'5" or 5'6".  I'm not sure

2     because I had on heels that night.  So his height I'm

3     not sure about, but he was a lot shorter than me.

4          Q.    Okay.

5          A.    And --

6          Q.    I don't mean to interrupt you.

7     Approximately how high were your heels that night?

8          A.    About three inches.

9          Q.    Okay.  And was he white,

10    African-American, hispanic?

11         A.    White.

12         Q.    Do you recall anything about the way he

13    looked?

14         A.    Yes.  He had a buzz cut and like dark

15    features like eyes and stuff like that.

16         Q.    Was he wearing glasses or anything like

17    that?

18         A.    No.

19         Q.    The officer that's sitting here with us

20    today, does that look like the officer that was asking

21    you the questions?

22         A.    They resemble each other.  I'm not sure

23    if it's him or not, but they have like the same facial

1   structures, the dark eyes, but the guy had more of a

2   buzz -- it was short, but it was kind of a buzz cut.

3          Q.    Could you tell the color of the hair?

4          A.    It was dark.

5          Q.    Okay.  And this officer that was asking

6   you the questions, apart from the initial conversation

7   you told us with the two officers, was this the officer

8   that you mainly spoke with --

9          A.    Yes.

10         Q.    -- outside the iBar?

11         A.    Yes.

12         Q.    Did any other officers ask you questions?

13         A.    They were kind of all throwing out

14  questions, but this officer was the closest to me.

15         Q.    Okay.

16         A.    And Frizell was kind of talking, and then

17  there were some other officers talking and -- but this

18  particular officer was directing his conversation to

19  me.

20         Q.    So there was --

21         A.    But they were asking questions, but he

22  was more so directing his questions to me.

23         Q.    Would it be fair to say there was a bit

1    of a commotion outside with --

2         A.     Absolutely.

3         Q.     -- Ms. Frizell talking and the officers

4    talking?

5         A.     Absolutely.

6         Q.     And from what I had asked you earlier,

7    you said that Ms. Frizell was emotional and agitated--

8         A.     Yes.

9         Q.     -- in your complaint.  What do you mean

10   by that?

11        A.     Her reaction to what was going on.  She

12   was very loud and just in disbelief, and she was

13   externally showing that, just couldn't believe just

14   what happened.  So she was very loud in that aspect.

15        Q.     Was she showing that to the police

16   officers --

17        A.     Absolutely.

18        Q.     -- that were there?  Do you recall

19   specifically hearing her say anything to the police

20   officers?

21        A.     Yes.

22        Q.     Okay.  What was she saying to the police

23   officers?

1    A.    She was trying to tell them what happened

2    and that I got punched in the face and that we only had

3    been in there 10 or 15 minutes, ordered our drink, and

4    I got punched in the face by the woman that was

5    standing there.

6        Q.    At this point when Ms. Frizell was

7    telling the officers that, was that other patron with

8    her as well?

9        A.    They --

10       Q.    The one who punched you.

11       A.    They were not together, no.

12       Q.    Okay.

13       A.    She was outside, yes.

14       Q.    Okay.  Did you hear that other patron

15   speaking with the police officers at all?

16       A.    She was telling an officer that she told

17   me that she was sorry.

18       Q.    Did you hear her say anything else?

19       A.    No, she just -- she was standing there

20   saying I told her I was sorry.  I told her I was sorry.

21   She just kept saying that over and over.

22       Q.    Is this when you noticed that she was

23   intoxicated --

1      A.    Yes.

2      Q.    -- and could barely stand?

3      A.    Yes.

4      Q.    Apart from telling the officer over and

5  over that she was sorry and that she told you she was

6  sorry, did you hear her say anything else?

7      A.    No.

8      Q.    What about her companion?  Did you hear

9  him say anything to the officers?

10      A.    No.

11      Q.    Okay.  So you told us that one officer

12  directed his questions to you while this commotion was

13  going on, correct?

14      A.    Yes.

15      Q.    Okay.  And did you answer his questions?

16      A.    Yes.

17      Q.    Okay.  When you were answering his

18  questions, were you emotional or agitated at all?

19      A.    Not at all.

20      Q.    Did you answer the questions calmly?

21      A.    Yes.

22      Q.    To the best of your ability, can you tell

23  me what questions were posed to you and your responses?

1    A.    He -- when Frizell initially came out,

2 she was trying to tell them what happened and pointed

3 out the lady who had hit me, and at that time Frizell

4 was doing a lot of the talking; and I was just standing

5 there, and they told her to shut the fuck up and let me

6 speak.

7    Q.    And who said that?

8    A.    One of the officers but --

9    Q.    Do you know which officer?

10    A.    No, but it was probably one of the

11 officers that initially came in just by where he was

12 standing.  And so I told Frizell to calm down, be

13 quiet, and let me tell them what happened.  Then I went

14 to tell the officers what happened, and the officer

15 closest to me asked me did I -- do I know her, and I

16 said, no, I've never seen her before.  You never had

17 any interaction with her?  You all didn't get into it?

18 You don't know her from anywhere?  No, no, no.  Tell me

19 what happened again.  So I told him what happened.  So

20 then he asked me again, tell me -- okay, tell me --

21 tell me again what happened.

22    Q.    The first time he asked you to tell him

23 what happened what did you tell him?

1    Q.  And it was the same thing that you told

2 us here today?

3    A.  Yes.

4    Q.  Okay. And then what happened after you

5 told him again what happened?

6    A.  So after about, I don't know, three or

7 four times maybe of him asking me to tell him he was

8 like, well, show me what happened.

9    Q.  And while you were talking to this

10 officer, was the commotion around still going on?

11    A.  Yes.

12    Q.  Lots of talking?

13    A.  Yes. Frizell was still talking. Kevin

14 was saying some stuff. The woman was still saying she

15 was sorry. And then he's asking me questions too.

16    Q.  Was Ms. Frizell still emotional and

17 agitated?

18    A.  Yes.

19    Q.  Did the other -- the patron that hit you,

20 did she seem emotional and agitated as well?

21    A.  No.

22    Q.  How did she seem? Just apologetic?

23    A.  Yeah, and very intoxicated.

1    Q.    So you said that the officer told you to

2  show him what happened?

3    A.    Yes.

4    Q.    And what did you take that to me?

5    A.    To show him how she pushed me.  To show

6  him -- to show him what happened.

7    Q.    So you took that to mean to show him on

8  his person how the woman pushed you?

9    A.    No, I did not take it like that.

10    Q.    Okay.  So you took it just to --

11    A.    Describe.

12    Q.    -- show him -- okay.

13    A.    Physically show what happened.

14    Q.    Okay.  And did you do --

15    A.    Not on him, but, yeah.

16    Q.    Okay.  And did you do that?

17    A.    Yes.

18    Q.    Okay.  And how did you show him what had

19  happened?

20    A.    I told him where I was standing and, of

21  course, I'm using my hands at this time because I know

22  the difference between show and tell.  So I was

23  standing there, and I showed him how I was standing in

1  the aisle and when people would come by that I would

2  lean forward and they would walk behind me.  This

3  particular lady, she came -- because I didn't know --

4  there were two empty stools there.  I didn't know who

5  they belonged to, but they were clearly someone's

6  because they had jackets on them.  So I knew not to sit

7  there.  The seat that Frizell was sitting on was empty.

8  So I stood.  And, of course, as a courtesy I always let

9  people go behind and not in between the person I'm

10  talking to.  So I would come in to Frizell.  So I was

11  showing the officer I would come in, and I was like the

12  woman came, and when I went to go in, she pushed me,

13  but when I was talking to the officer, he was on this

14  side of me.  So I had did like this (indicating).  I

15  was like when she came to come in between us, she

16  pushed me like this, and when I did my arm like this,

17  he took my arm, put it behind -- twisted it, put it

18  behind my back, pushed my elbow into my back, and

19  forced me over to a car.

20  　　　　Q.　　Did your arm make contact with the

21  officer at all?

22  　　　　A.　　Yes.

23  　　　　Q.　　So when you were using your arm to show

1    him how she -- this patron pushed you, your arm made

2    contact with the officer?

3         A.    Yes.

4         Q.    Where on his body did your arm make

5    contact?

6         A.    Probably his chest.

7         Q.    And this was the shorter officer, --

8         A.    Yes.

9         Q.    -- correct?  And so you were using your

10   left arm to show him?

11        A.    Yes.

12        Q.    And what part of your left arm made

13   contact with his chest?

14        A.    Probably my forearm here.

15        Q.    And then you said that when your arm made

16   contact the officer took your wrist; is that correct?

17        A.    Yes.

18        Q.    Your left wrist?

19        A.    He grabbed my wrist, twisted it, --

20        Q.    How did he twist it?

21        A.    (Indicating).  Twisted my wrist some type

22   of way, and it was really fast.

23        Q.    You wouldn't be able to tell me in which

1    way he twisted it?

2          MR. HUNDLEY:  I just object that it's vague.

3    Do you mean what direction?

4          MS. RUKAVINA:  Well, yeah, in what manner?

5          MR. HUNDLEY:  Degree?

6          MS. RUKAVINA:  Did he twist it side to side?

7    Did he --

8    BY THE WITNESS:

9          A.    No, in a circular.

10   BY MS. RUKAVINA:

11         Q.    Okay.  So he twisted it circularly?

12         A.    Uh-huh.

13         Q.    And was this just your wrist or did he

14   twist your whole arm?

15         A.    He grabbed me by my wrist to twist.

16         Q.    Okay.  And as he was doing that did he

17   pull your arm behind you?

18         A.    Absolutely.

19         Q.    Okay.  And this was your left arm,

20   correct?

21         A.    Yes.

22         Q.    And as he was doing this did he say

23   anything?

68

1      A.    No.  He didn't say anything until we got

2  over to the car.

3      Q.    So after he pulled your left arm behind

4  you what --

5      A.    And forced my elbow up in an upward

6  thrust or -- I don't know how to describe it.

7      Q.    Approximately, how high did he force your

8  elbow up?

9      A.    Up to the middle of my back.

10     Q.    To the middle of your back.  And you said

11  this happened in a matter of seconds?

12     A.    Yes.

13     Q.    It was a quick movement?

14     A.    Yes.

15     Q.    And when he forced your elbow upward, he

16  put you over a car?

17     A.    Yes.

18     Q.    Did you have to walk over to the car or--

19     A.    No.

20     Q.    -- were you at the car?

21     A.    He forced me over to the car.

22     Q.    So he forced you to walk over to the car?

23     A.    Yeah, and I went because the more -- I

1   knew to go because he was constantly pushing up on the

2   elbow and twisting the wrist at the same time.

3        Q.    And, approximately, how many steps did

4   you take to get to the car?

5        A.    Maybe six or seven.

6        Q.    And while he was forcing you to the car,

7   did he say anything to you?

8        A.    Yes

9        Q.    What did he say to you?

10       A.    What the fuck is your problem.  Don't you

11  ever put your hands on me.

12       Q.    Did he say anything else?

13       A.    I don't know.  He was saying some other

14  stuff as he was trying to -- he was like -- had me like

15  trying to slam me into the car and don't you -- and he

16  just kept -- he said it twice like don't you ever

17  fucking put your hands on an officer or something to

18  that effect.

19       Q.    Did you say something back to him?

20       A.    I was like you told me to show you what

21  happened.

22       Q.    Now, you said that he tried to slam you

23  into the car?

1    Q.   Okay.  And he wasn't saying anything to

2   you at that time?

3    A.   Just what I told you.

4    Q.   Okay.  That whole incident from when he

5   took your wrist to when he put you up against the car

6   and while you were up against the car, that's the only

7   thing that he said to you?

8    A.   At that time.

9    Q.   Okay.  Did you say anything to him other

10  than -- I believe what you said was, you told me to

11  show you?

12   A.   Yes.

13   Q.   Did you say anything else to him?

14   A.   No.

15   Q.   Okay.  Did he eventually release you from

16  the car?

17   A.   Yes.

18   Q.   Approximately, how long were you on the

19  car?

20   A.   I'm not sure.

21   Q.   Would it have been a few seconds?  Would

22  it have been a minute?

23   A.   Seconds.

1    Q.    And during that time when you were on the

2    car, did the officer kick you?

3    A.    No.

4    Q.    Did he punch you?

5    A.    No.

6    Q.    Did he physically hurt you in any way

7    other than the pressure he was applying to the wrist

8    and your back?

9    A.    Only to the wrist and elbow, yeah.

10    Q.    Was he applying any pressure directly to

11    your elbow or was it your wrist that was behind your

12    back?

13    A.    Both the wrist and elbow.

14    Q.    Okay.  Did he have a second hand on your

15    elbow?

16    A.    Yes.

17    Q.    Okay.  So one of his hands was on your

18    wrist and the other one was on the elbow?

19    A.    Yes.

20    Q.    Now, while you were up against the car,

21    were there other people around?

22    A.    Yes.

23    Q.    Okay.  Was anybody saying anything to you

1      A.    No.

2      Q.    Approximately, how long after the officer

3 released you from the car did you leave the scene?

4      A.    Seconds.

5      Q.    So you did not go back inside the bar?

6      A.    No.

7      Q.    And did you go immediately to the police

8 station?

9      A.    I went to my car, and Frizell was still

10 out there with the officers and everybody else.  I was

11 already in my vehicle and waiting for her to come so we

12 could go to the police station.

13      Q.    How long did you wait in the vehicle for

14 her?

15      A.    That had to be a few minutes.

16      Q.    And once she came to the car did you go

17 to the police station then?

18      A.    Yes.

19      Q.    Did you know where police station was?

20      A.    No.

21      Q.    How did you find the police station?

22      A.    Someone gave Frizell the address, and I

23 googled it.

1   he came out, and one of the officers -- he asked one of

2   the officers what was going on, and the officer told

3   him she said she got hit.  And he's like nothing

4   happened.  Nothing happened in here.  He went back in,

5   came back out, and said he talked to the barmaid and

6   someone else.  He did say he spoke to two different

7   people, and they said, nothing happened, she didn't get

8   hit.  And the officer said to me, he said nothing

9   happened.  They're saying nothing happened.  By this

10  time the -- the patron came out with the guy, and she's

11  standing there saying that she was sorry.

12         Q.    What officer told you that the iBar owner

13  said nothing happened?

14         A.    I don't know which one it was.

15         Q.    Okay.  It was not the one that was asking

16  you the questions --

17         A.    No.

18         Q.    -- that you were dealing with?

19         A.    No.  There was one closer to the door.

20         Q.    And is there any way that you can tell me

21  physically what he looks like?

22         A.    No.

23         Q.    Did you hear any other conversation

1  between the iBar owner and the police?

2          A.      Yes.

3          Q.      Okay.  What else did you hear?

4          A.      There was -- like I said, there was a lot

5  of commotion going on, and I wasn't saying much to

6  nothing at all because Frizell was trying to get them

7  to understand what was going on, and aside from the

8  owner someone else came back and forth out of the place

9  and kept saying they're saying nothing happened, nobody

10 saw anything, didn't anything happen, she didn't get

11 hit, they're saying she didn't get hit.  So that's the

12 conversation from whoever this other guy was

13 communicating back with the owner saying that I didn't

14 get hit.  He was trying to convince him and the

15 officers that I didn't get hit.

16         Q.      So there was --

17         A.      Nobody --

18         Q.      -- another person that was trying to

19 convince the owner and the officers that you didn't get

20 hit?

21         A.      With the owner.  I guess the owner had

22 this guy come out here to confirm that I didn't get

23 hit.

1  with the officer who was asking you questions?

2      A.    Before.

3      Q.    Okay.  So this was all happening while

4  the officer was trying to ask you questions?

5      A.    Correct.

6      Q.    The officer that you were dealing with

7  directly, after you told him in response to what he was

8  telling you that he had asked you to show him what

9  happened, did you say anything else to him after that?

10      A.    No, just the fact that you told me to

11  show you.

12      Q.    Did you apologize to him?

13      A.    No.

14      Q.    This officer, did he ever place handcuffs

15  on you?

16      A.    No.

17      Q.    Did any officer at the scene place

18  handcuffs on you?

19      A.    No.

20      Q.    Okay.  Apart from the conversations you

21  told us about between the owner and the police, the

22  female bouncer and the police, Ms. Frizell, and

23  Mr. Dixon, do you recall any other conversations that

1    were happening at that time with any patrons and the

2    police?

3          A.    No.

4          Q.    Did you have any conversation directly

5    with the owner of the iBar?

6          A.    No.

7          Q.    What about the bouncer?  Did you speak

8    with her?

9          A.    No.

10          Q.    At anytime from the time that the police

11    officer put your hand behind your back and put you up

12    against the car did you tell him that he was hurting

13    you?

14          A.    No.

15          Q.    When he released you from the car, did

16    you tell him that you were in pain or injured in any

17    way?

18          A.    No.

19          Q.    And then you told us that when you left

20    you went to the police station, correct?

21          A.    Yes.

22          Q.    And it was you and Ms. Frizell?

23          A.    Yes.

1    voicemail.  You do not recall receiving this message on

2    May 25th of 2011?

3           A.    No, I don't recall.

4           Q.    Again, I don't want to know any

5    conversation with your attorney, but had you sought out

6    your attorney as of May 17th of 2011 in this case?  Do

7    you know whether you were represented at that time?

8           A.    You said May what?

9           Q.    May 17th of 2011.

10          A.    I believe so.

11          Q.    Okay.  Do you -- strike that.  Okay.  I

12   don't have very much left.  I just wanted to go through

13   -- I know you mentioned that you have a copy of the

14   video from iBar.  I wanted to go through that video

15   with you.  I apologize.  This is on a computer, but it

16   does not go on in a DVD player so we'll have to just --

17   there's no audio so there's nothing to be taken down.

18                       And just for the record this is the

19   video from the outside of the iBar, and I'm going to

20   start it at 23:46 and zero seconds.

21          MR. HUNDLEY:  Can you identify which camera it

22   is?

23          MS. RUKAVINA:  This came from -- it's CH05_000.

1    MR. HUNDLEY:  Yes, so camera five?

2    MS. RUKAVINA:  That's my guess.

3    MR. HUNDLEY:  Okay.  And what was the time

4 stamp again?  I'm sorry.

5    MS. RUKAVINA:  Uh-huh.  No, no problem.  It's

6 23:46:00.

7 BY MS. RUKAVINA:

8    Q.    I'm going to play a little part of it.

9 We'll try to see if we can identify some of the police

10 officers.

11   A.    Okay.

12   Q.    And then we'll go back.  If you need me

13 to go back, we'll go back.  I don't want to harp on it,

14 but we'll just see what we can find from the video.  So

15 I apologize.  I'm about to turn my back on you guys.

16        And the reason that I put it to this

17 point, just to let you know, is this is the first time

18 I see the officers come to the door.

19   A.    Okay.

20   Q.    And tell me if you recall differently.

21 So this is the officer walking out, is that correct,

22 and he's motioning for someone else to come out.  And

23 then it looks like three people -- two people come out

1   with a third.  That officer that we saw, was that one

2   of the first two that came on the scene, one of the

3   initial officers?

4           A.    Yes.

5           Q.    Okay.  And that officer looks like he has

6   a bald head?

7           A.    Yes.

8           Q.    Okay.  So that was one of the officers

9   that you encountered as you were trying to go outside?

10          A.    Yes.

11          Q.    Okay.  Do you see yourself here?

12          A.    Yes.

13          Q.    Are you the one in the tan top with the

14  short hair?

15          MR. HUNDLEY:  I'm sorry.  For the record you've

16  paused it.  Can you give us the time?

17          MS. RUKAVINA:  Oh, sure, yeah.  I have paused

18  it 23:46:19.  Sorry about that.

19  BY THE WITNESS:

20          A.    It's the gray and black top with the

21  short hair.

22  BY MS. RUKAVINA:

23          Q.    Okay.  And is that black leggings?

1        A.    Yes.

2        Q.    Okay.  And then the woman to your left,

3  is that Ms. Frizell?

4        A.    Yes.

5        Q.    Okay.  And then the gentleman behind you,

6  is that Mr. Dixon?

7        A.    Yes.

8        Q.    Okay.  The lady we see to the right,

9  she's got blond hair, is that the female bouncer?

10       A.    Yes.

11       Q.    Okay.  So this point in time is this when

12  the officer asked you to step outside?

13       A.    Yes.

14       Q.    So we'll watch a little further.  It

15  seems like there's some conversation between the

16  officer and Ms. Frizell, correct?

17       A.    Yes.

18       Q.    And the doors closed.  And then one, two,

19  three, four people step out, five people step out.

20       A.    That's the other officer that came.

21       Q.    And I'm going to --

22       A.    Pause it.

23       Q.    I'm going to pause it at 23:46:43.  So we

just saw five officers step out of the iBar; is that

correct?

    A.    No.

    Q.    No?  Okay.  How many officers?  Were

there other patrons and officers that stepped out?

    A.    That's -- that's not an officer.

    Q.    Okay.  Do you want me to back it up?

    A.    Yeah.  They are not all officers.

    Q.    Sure.  Let's take a look at how many

officers come out.  Let's just go back a little bit.

Okay.

    MR. HUNDLEY:  And you're restarting at what

point?

    MS. RUKAVINA:  I'm restarting at 23:46:01.

    THE WITNESS:  That's the one officer.

BY MS. RUKAVINA:

    Q.    Right.  And then you and Ms. Frizell and

Mr. Dixon?

    A.    Uh-huh.

    Q.    And so at this point there's only one

officer outside, correct?

    A.    Yes.

    Q.    Okay.

1      A.    That's not an officer.

2      Q.    Okay.

3      A.    That's not an officer.

4      Q.    Okay.  Those are just patrons?

5      A.    That's an officer.

6      Q.    Okay.

7      A.    That's not an officer.  And I think

8  that's an officer.

9      Q.    Okay.  Yeah, let's pause it.  It looks

10  like --

11     A.    Yes.

12     Q.    So two additional officers came out?

13     A.    Yes.  And as you can see --

14     Q.    You walked back to the side of the

15  building as you had told us, right?

16     A.    Correct.

17     Q.    With one of the initial officers?

18     A.    Correct.

19     Q.    Now, these two officers that we see, we

20  see one has a hat and one does not.  Can you

21  distinguish which one was the other initial officer

22  that came?

23     A.    The one without the hat.

1    Q.    Okay.  Now, the one without the hat, did

2    you have any other dealings with him?

3    A.    No, not that I recall.

4    Q.    Okay.  What about the one with the hat?

5    Do you recall having any direct dealings with an

6    officer with the hat?

7    A.    Not that I recall.

8    Q.    Okay.  And then what about when you were

9    back at the police station the next day?  Did you have

10   any dealings with the officer without a hat?

11   A.    No.

12   Q.    Okay.  Obviously, we can't see the face

13   of the officer with the hat.

14   A.    Correct.

15   Q.    Would it be -- it wouldn't be fair for

16   you to make a judgment, correct?

17   A.    Correct.

18   Q.    Okay.  I'm going to go ahead and play it

19   at 23:46:40.  And, again, this is a time when you and

20   the other officer are by the side of the building

21   talking, correct?

22   A.    Correct.

23   Q.    Okay.  I'm just going to play it for a

1    little bit.  Is this the point that you were telling me

2    that there was some commotion; Ms. Frizell was talking

3    and other people were talking?

4         A.    Yes.

5         Q.    Okay.  Have you seen the owner of the

6    iBar come out yet?

7         A.    No.

8         Q.    Okay.

9         A.    That's the lady --

10        Q.    Okay.

11        A.    -- who talked to the bouncer.

12        Q.    Okay.  So at 23:47:17 a few seconds

13   before that there was a man and a woman talking to the

14   female bouncer, correct?

15        A.    Yes.

16        Q.    And the woman is the one who hit you in

17   the face?

18        A.    Yes.

19        Q.    And then the man is her companion as

20   we've called him?

21        A.    Yes.

22        Q.    Okay.  So they have now stepped outside.

23   It seems like she's trying to talk to the officers that

1    are there; is that correct?  Do you recall her talking

2    to them?

3          MR. HUNDLEY:  That's been asked and answered.

4    BY MS. RUKAVINA:

5          Q.    Let me know if you see the owner come

6    out, okay, and we'll see if we can identify him.  I'm

7    pausing at 23:49:51.  It appears that one of the

8    officers, the one without the hat, went back into the

9    bar, correct, at this time?

10         A.    Yes.

11         Q.    And have you seen the owner of the iBar

12   come out yet?

13         A.    No.

14         Q.    Not on the video?  Okay.  I'm going to

15   pause it again at 23:49:59, and we see a second

16   officer, the one with the hat, go back in the bar; is

17   that correct?

18         A.    Yes.

19         Q.    Okay.  So now from what we saw with the

20   three officers there was only one other officer with

21   you in the back, is that right, or did other officers

22   come from somewhere we did not see?

23         A.    There were other officers still out

1          A.    Correct.

2          Q.    Okay.  I'm going to move that back so we

3    can just put that on the record.  I'm sorry.  We're

4    just going to have to -- it's a little difficult.

5          MR. HUNDLEY:  Tell us where you're starting at

6    again.

7          MS. RUKAVINA:  At 49:35, and then I'll try to

8    pause it the moment I see the movement in the back so

9    we can just get a better time frame.  I'm sorry.  That

10   was 48.  If I said 49, I was mistaken.

11         THE WITNESS:  Right there.

12   BY MS. RUKAVINA:

13         Q.    Okay.  So we're at 23:50:08, and in the

14   back we see you and the officer with you, correct?

15         A.    Correct.

16         Q.    Did you see it the first time we watched

17   it?

18         A.    Yes.

19         Q.    Okay.  And this is the first where he was

20   walking you to the car, correct?

21         A.    Yes.

22         Q.    And at this point your left arm was

23   behind your back?

1    A.    Yes.

2    Q.    Okay.  And your purse was on your right

3  arm?

4    A.    Yes.

5    Q.    Okay.  Did you have any problems walking

6  to the car?

7    MR. HUNDLEY:  Objection, vague.  Go ahead.

8    MS. RUKAVINA:  Go ahead.

9  BY THE WITNESS:

10    A.    No.

11  BY MS. RUKAVINA:

12    Q.    You weren't resisting in any way walking

13  to the car?  You were compliant?

14    A.    Yes.

15    Q.    I've stopped it for the record at

16  23:50:14.  It appears that you're up against the car;

17  is that correct?

18    A.    Yes.

19    Q.    Okay.  I will play it back and we can

20  watch it, but from what I saw, the car doesn't move

21  when you're put up against the car.  I just want you to

22  tell me if you agree with that statement.  I'm going to

23  start it at 23:49:32.  Would you agree with the

1  statement that the car didn't move when you were put up

2  against the car?

3      MR. HUNDLEY:  I just object to the foundation.

4  BY THE WITNESS:

5      A.    I'm trying to wait until the entire

6  scene.

7  BY MS. RUKAVINA:

8      Q.    Uh-huh.  At this point you're up against

9  the car, though, right?

10     A.    Yes.

11     Q.    I'm just going to pause it.  It seems

12 that at 23:50:35 is when you were released from the

13 vehicle, correct?

14     A.    Yes.

15     Q.    Did you see the car move?

16     A.    No.

17     Q.    Okay.  I'm just going to let it run for

18 another little bit because it appears to me that you

19 stay in that area and continue talking with the police

20 officer; is that correct?

21     A.    Yes.

22     Q.    Okay.  Now, he doesn't have a hold of you

23 at this time, does he?  Has he released you?

1          A.    Yes.

2          Q.    Okay.  He has released you?

3          A.    Yes.

4          Q.    Do you recall what conversation was going

5     on back there?

6          A.    No.

7          Q.    Okay.  Let me know when you see yourself

8     walk out?

9          A.    Right there.

10         Q.    Okay.  So I'm stopping it at 23:51:08.

11    So maybe a second or two before that is when you walked

12    away.  Is that when you went to your vehicle?

13         A.    Yes.

14         Q.    Okay.  Was Ms. Frizell back there

15    somewhere?

16         A.    No.  She was still at the end of the

17    building.

18         Q.    Okay.  Can we see her by any chance in

19    what we're looking at?

20         A.    No, just Dixon.

21         Q.    Just Dixon.  And Dixon is the one in the

22    white, right?

23         A.    Yes.

1        MR. HUNDLEY:  Okay.

2    BY MS. RUKAVINA:

3        Q.    I'm not sure if you -- what kind of phone

4    do you have?  Can you take a screen grab of it?

5        A.    An iPhone.

6        Q.    Okay.  If you can take a screen grab and

7    e-mail that, that would be --

8        A.    Yes.

9        Q.    Thank you.  Also, just in general, apart

10   from the officer that had directed questions to you did

11   any other officer on April 2nd of 2011 put his hands on

12   you?

13       A.    No.

14       MS. RUKAVINA:  Those are all the questions I

15   have.

16       MR. HUNDLEY:  Okay.  I just have a couple

17   follow-ups.

18                    CROSS-EXAMINATION

19   BY MR. HUNDLEY:

20       Q.    When you looked at the video just a

21   moment ago, Tanya, and you pointed out what we could

22   see on the video as far as when you were grabbed behind

23   back, as you described, correct?

1    Q.    While looking at the video just a moment

2  ago, you were asked as to whether or not you ever

3  identified the owner of the iBar.  Did you ever meet

4  anyone that night who identified himself as the owner

5  of the iBar?

6    A.    No.

7    Q.    Okay.  But there was someone that you saw

8  at some point throughout the night that appeared to

9  either be the owner or in charge; is that right?

10   A.    No.  In all of the commotion outside,

11  apparently looking at the video now, in all of that --

12  those people that came out, it had to have been one of

13  them because one of the officers said that the owner

14  said nothing happened.

15   Q.    Okay.

16   A.    So that's why I assumed that was the

17  owner.

18   Q.    Did you see a portion of the video that

19  we looked at where there was a larger gentleman that

20  looks like maybe he was working security?  He was

21  gesturing at some point.  Someone who was not a police

22  officer.  Do you know who I'm referring to?

23   A.    Yes, I do remember the larger gentleman.

1      Q.    Okay.   Is that someone that appeared to

2   you at the time that night to be an employee of the

3   iBar?

4      A.    Yes.

5      Q.    And do you recall that individual or

6   anyone else that may have been in security or other

7   employee of the iBar say anything in particular?

8      MS. RUKAVINA:   Apart from what she testified as

9   to the female bouncer?

10     MR. HUNDLEY:   Correct.

11     THE WITNESS:   Saying to me?

12     MR. HUNDLEY:   Anything that you overheard at

13  all.

14  BY THE WITNESS:

15     A.    Just they were talking to the officers

16  and they were -- they told the officers that the

17  barmaid didn't see anything and one other guy he said

18  -- I don't know what he called him.  He didn't say his

19  name, but whatever his position was.

20     MR. HUNDLEY:   Okay.

21     THE WITNESS:   My barmaid said she didn't see

22  anything.  She did not get hit.  Nothing happened.

23  They are saying nothing happened.

1    seen the video?  Again, did you see an officer --

2         A.    I'm not sure.

3         Q.    -- make that statement?

4         A.    Yes.

5         Q.    Okay.  And you don't know which officer

6    made that statement?

7         A.    No.

8         Q.    Okay.  And was that statement made before

9    the officer told you to show him what happened?

10        A.    Yes.

11        Q.    There's also some questions about whether

12   when you made contact with the officer you used any

13   force.  So let me ask you this way.  The contact -- how

14   would you describe the contact that your left arm made

15   with the officer?

16        A.    If he wasn't standing close to me, he

17   probably wouldn't -- I probably wouldn't have made

18   contact with him.

19        Q.    How would you describe the contact?  Did

20   you just mildly touch him?  Did you hit him?

21        A.    My intention wasn't to touch him.

22        Q.    No, I understand, but I'm asking the type

23   of contact that you made with the officer -- you said

1    that it wasn't forceful.  I'm asking you to describe

2    how you would describe the contact you did make,

3    whether or not --

4           A.    A touch.

5           Q.    -- you intended to?

6           A.    A touch with the back of my --

7           Q.    Forearm?

8           A.    With the back of my forearm.

9           Q.    Okay.  Now, you also testified that you

10   did this with your left hand but the patron used her

11   right, correct?

12          A.    Yes.

13          Q.    Why did you use your left hand if the

14   officer was to your left and you didn't intend to touch

15   him?

16          A.    To show him what she did with her

17   forearm.

18          Q.    Why didn't you use your right arm?

19          A.    Because he was on that side of me.

20          Q.    So if you didn't intend to touch him, why

21   did you use the arm that was closest to him?

22          A.    Because that's the way I was describing

23   it.