## Page 1

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

TANYA GILL,

        Plaintiff,

    -vs-             No. 12 CV 2963

VILLAGE OF MELROSE PARK, et al.,

        Defendants.

        The discovery deposition of KEVIN DIXON, called for examination, taken before SUZANNE BURKE, a Certified Shorthand Reporter in the State of Illinois, at 1001 West Van Buren Street, Chicago, Illinois, on the 10th day of October, 2012, A.D., commencing at the hour of 10:11 o'clock a.m.

ORIGINAL

ADVANTAGE REPORTING - (800) 347-3124

## Page 2

APPEARANCES:

Mr. David M. Hundley
(Hundley Law Group)
1001 West Van Buren Street
Chicago, Illinois 60607
(312) 212-3343
dmb@hundleylaw.com,

    appeared on behalf of the plaintiff;

Ms. Zrinka Rukavina
(Hervas, Condon & Bersani, P.C.)
333 Pierce Road, Suite 195
Itasca, Illinois 60143
(630) 773-4774
zrukavina@hbcattorneys.com,

    appeared on behalf of the defendant.

---------

EXHIBIT H (Blumberg No. 5110)

ADVANTAGE REPORTING - (800) 347-3124

## Page 3

I N D E X

| WITNESS: | PAGE |
|---|---|
| KEVIN DIXON | |
| Examination By Ms. Rukavina | 4 |
| Examination By Mr. Hundley | 67 |
| Further Examination By Ms. Rukavina | 94 |
| Further Examination By Mr. Hundley | 97 |

E X H I B I T S

| DEPOSITION EXHIBIT NOS. | PAGE |
|---|---|
| 1 | 86 |

NOTE: Exhibit retained by counsel

ADVANTAGE REPORTING - (800) 347-3124

## Page 4

MS. RUKAVINA: If you would please swear him in.

    (Witness sworn.)

KEVIN DIXON, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. RUKAVINA:

    Q.  If you would please state and spell your name for the record?

    A.  **Kevin Dixon, K-e-v-i-n D-i-x-o-n.**

    MS. RUKAVINA: Let the record reflect that this is the deposition of Kevin Dixon, taken in Gill versus Village of Melrose Park, et al., pursuant to subpoena and agreed upon by today's date by the parties and the deponent, taken pursuant to the Federal Rules of Civil Procedure and any applicable local Rules of the Northern District.

BY MS. RUKAVINA:

    Q.  Mr. Dixon, have you ever given a deposition before?

    A.  **No.**

    Q.  Okay. Things should go pretty smoothly

ADVANTAGE REPORTING - (800) 347-3124

**Page 17**

1 problems with him?
2   A.   No.
3   Q.   Was this the one and only time you've
4 been arrested?
5   A.   Yes.
6   Q.   So it's fair to say you have no
7 convictions for any felonies?
8   A.   No.
9   Q.   You have no convictions for any
10 misdemeanors involving fraud?
11   A.   No, I don't.
12   Q.   Apart from being arrested, has there ever
13 been a situation in which you've had any contact
14 with police?
15   A.   No.
16   Q.   What's your height, sir?
17   A.   Five-ten.
18   Q.   Approximately how much do you weigh?
19   A.   240.
20   Q.   And this is approximately how much you
21 weighed on April 2nd of 2011?
22   A.   I would say, yes.
23   Q.   You know Ms. Gill, Tanya Gill, correct?

ADVANTAGE REPORTING - (800) 347-3124

**Page 18**

1   A.   Yes.
2   Q.   Can you tell me how you know Ms. Gill?
3   A.   Casual friends.
4   Q.   And how long have you been casual
5 friends?
6   A.   About maybe three years, I believe.
7   Q.   Do you recall how you met?
8   A.   Via Facebook.
9   Q.   And as casual friends, was Ms. Gill
10 someone you would go out to dinner with or to a
11 bar or a club or anything like that?
12   A.   Yeah, we've gone out to, you know, a bar
13 or met out for drinks.
14   Q.   Did you see Ms. Gill at the iBar on
15 April 2nd of 2011?
16   A.   Yes.
17   Q.   What was the reason for your presence at
18 the iBar that night?
19   A.   If I remember correctly, for a birthday
20 party.
21   Q.   Do you recall who the birthday party was
22 for?
23   A.   No, I don't.

ADVANTAGE REPORTING - (800) 347-3124

**Page 19**

1   Q.   Approximately what time did you make it
2 to the iBar that night?
3   A.   I was there early, so I want to say
4 9:00 o'clock.
5   Q.   And did you go there by yourself?
6   A.   Yes.
7   Q.   Do you recall was April 2nd a Saturday,
8 April 2nd of 2011?
9   A.   I believe so.
10   Q.   Okay. Did you work on Saturdays at that
11 time?
12   A.   I worked some weekends. I'm not sure if
13 I worked that particular Saturday or not.
14   Q.   Okay. If I asked you if you remember
15 what you did that day before going to the iBar,
16 would you be able to remember that?
17   A.   No.
18   Q.   Not specifically?
19   A.   No, not specifically.
20   Q.   Now, when you got to iBar at 9:00
21 o'clock, were there people present there who you
22 knew?
23   A.   Yes.

ADVANTAGE REPORTING - (800) 347-3124

**Page 20**

1   Q.   Could you name some of the people who
2 were present?
3   A.   The owner, Bart. I don't know Bart's
4 last name. And I believe security was there; and
5 I'll be honest, I don't remember their names.
6 It's, like -- I can't remember their names.
7   Q.   Okay. And that's referring to the
8 security, you don't remember the security names or
9 you don't remember the individual's names -- the
10 other individuals who were there?
11   A.   The securities.
12   Q.   Okay. What about the people you knew who
13 were there for the birthday party, was there
14 anybody there at that time?
15   A.   I don't remember. It was -- I was there
16 early. You know, I don't think -- the party
17 probably didn't start until 10:00. So I'm not --
18 I don't remember fully on that.
19   Q.   Okay. Did you know Bart, the owner of
20 the iBar, at that time?
21   A.   Yes.
22   Q.   How did you know Bart?
23   A.   From I've done and promoted parties at

ADVANTAGE REPORTING - (800) 347-3124

### Page 21

1 the iBar.
2 Q. Was this a party that you were promoting
3 that night, or was it more of a personal party?
4 A. I believe it was a party that I was
5 promoting or part promoting.
6 Q. And the party promoting, is that
7 something you do on the side, or do you have a
8 company that does that?
9 A. I used to do it with a friend. I don't
10 do it any longer.
11 Q. Okay. What about in April of 2011, is
12 that when you were doing it with a friend?
13 A. Yes.
14 Q. And did you and the friend have a company
15 or did you just do that on the side?
16 A. Just on the side.
17 Q. When you got there at 9:00 o'clock to the
18 iBar on April 2nd of 2011, did you have any
19 conversation with Bart?
20 A. Yes, I'm sure.
21 Q. And what was said between you?
22 A. I'm sorry, I don't remember.
23 Q. Okay. And then the security officers you

### Page 22

1 said were there -- strike that.
2     Had you been at the iBar before
3 April 2nd of 2011?
4 A. Yes.
5 Q. Okay. The security officers that were
6 there that night, were those people who were
7 familiar to you?
8 A. One of the four, yes.
9 Q. And you just don't recall that
10 individual's name?
11 A. No.
12 Q. Can you physically describe the
13 individual to me?
14 A. Tall, Caucasian male, dark hair, big
15 build. If I had to guess, he's probably about
16 six-three, six-four.
17 Q. And then there were three other security
18 officers there from what you could see?
19 A. Yes.
20 Q. Now, when you were there at 9:00 o'clock,
21 where were the security officers located? Were
22 some outside and some inside?
23 A. Yes, two in and the other two outside.

### Page 23

1 Q. And the one that you recognized, the
2 tall, big built man, was he outside or inside?
3 A. Inside.
4 Q. And from your perspective of what you
5 viewed that night, did he stay in one area or did
6 you walk around inside of the bar?
7 A. Walked around.
8 Q. Do you recall approximately how long you
9 were at the iBar until you saw Ms. Gill?
10 A. No.
11 Q. Was it just a handful of minutes; was it
12 more like hours? Is there any way you can
13 approximate?
14 A. It was between one and two hours, I would
15 say.
16 Q. During those one and two hours that you
17 were at the iBar before Ms. Gill came, did you
18 have any alcoholic drinks?
19 A. I don't remember.
20 Q. Would it have been unusual for you to be
21 at a bar for a couple hours and not have any
22 alcoholic drinks?
23 A. Would it be unusual?

### Page 24

1 Q. Right.
2 A. No.
3 Q. So that's something that could happen?
4 A. Yes.
5 Q. When you first saw Ms. Gill at the iBar
6 on April 2nd of 2011, where were you?
7 A. I believe inside.
8 Q. Okay. Can you explain to me maybe where
9 you were sitting or standing, if that's the case?
10 A. I don't remember that exactly.
11 Q. Do you recall, had you been talking to
12 someone at that point or were you just hanging out
13 by yourself?
14 A. By the time she got there, there were
15 more people inside, so I probably had, you know,
16 talked and socialized prior to her getting there.
17 Q. Okay. Do you recall any of the names of
18 the people who were present by the time Ms. Gill
19 came?
20 A. No.
21 Q. Okay. When you first saw Ms. Gill at the
22 on iBar on April 2nd, 2011, where was she?
23 A. Inside.

Page 25

1  Q. Was she standing at the bar, sitting,
2  just coming in? Do you recall when you first saw
3  her?
4  A. I believe when she came in, I saw her and
5  we were both at the bar, if I remember correctly.
6  Q. Was she with anybody?
7  A. Not to my recollection.
8  Q. Did you have any conversation with
9  Ms. Gill when you first saw her come into the bar?
10 A. Yes.
11 Q. And what was that conversation?
12 A. I'm sure I just greeted her probably. I
13 don't remember specifics.
14 Q. While you were at the iBar on April 2nd
15 of 2011, did you become aware of an incident that
16 occurred between Ms. Gill and another patron?
17 A. Yes.
18 Q. Okay. How did you become aware of that
19 incident?
20 A. She told me.
21 Q. And when did she tell you?
22 A. After the incident happened.
23 Q. Approximately how long after the incident

Page 26

1  happened?
2  A. It was pretty immediate after it
3  happened.
4  Q. So it was still that night?
5  A. Absolutely.
6  Q. And were you still at the iBar?
7  A. Yeah, yeah.
8  Q. Okay. So you did not see the incident
9  that occurred between Ms. Gill and the other
10 patron?
11 A. No.
12 Q. And when Ms. Gill told you about the
13 incident, what did she tell you?
14 A. I believe, if I remember correctly, she
15 said someone hit her. That's all I remember.
16 Q. Okay. And what was your response to her?
17 A. I think I asked her who did it and were
18 they still in there.
19 Q. Was there any other conversation between
20 the two of you at that time? Did she point out
21 the person or tell you anything more?
22 A. I don't think -- at that time I don't
23 think the person was in there any longer, if I

Page 27

1  remember right.
2  Q. And, I'm sorry, the conversation with
3  Ms. Gill, was that still inside the iBar?
4  A. Yes.
5  Q. When Ms. Gill told you that this woman
6  had hit her or this individual had hit her, was
7  she upset?
8  A. Yes.
9  Q. What happened after she told you that
10 this woman hit her, this individual, excuse me,
11 hit her and you asked if she was still in the bar?
12 A. I can't be for sure. I believe I went to
13 Bart, who is the owner, and asked what's going on.
14 Q. And was Bart inside the bar at the time?
15 A. I believe so, yes.
16 Q. And what did Bart tell you in response?
17 A. I believe he said something to the extent
18 that it was being taken care of.
19 Q. Did you ask him what that meant, that it
20 was being taken care of?
21 A. No. Because it was kind of crazy at that
22 point, you know, and I believe he was trying to
23 get everything calmed down, so...

Page 28

1  Q. What do you mean it was crazy at that
2  point?
3  A. They were taking people outside, I
4  believe, and just trying to get the situation
5  cared for.
6  Q. When you say they, who do you mean?
7  A. Security.
8  Q. Okay. So the security officers from the
9  bar brought people outside?
10 A. Yes.
11 Q. Did Bart tell you that he saw the
12 incident between Ms. Gill and the other patron?
13 A. I don't remember. I don't remember if he
14 said he saw it.
15 Q. At that time, after you spoke with Bart,
16 did you speak with any of the other employees at
17 the iBar?
18 A. Maybe. I can't be sure. I'm not sure.
19 Q. Okay. When you were saying the
20 security -- strike that.
21     When you said that security was
22 bringing people outside, did you believe it was in
23 relation to this incident?

## Page 37

1  A. Yes.
2  Q. Okay. Now, sorry, going back to when you
3  were outside when you first saw the police
4  officers. Apart from the officers, the security
5  members, Ms. Gill, you, and Ms. Gill's friend, was
6  there anybody else outside with you?
7  A. There were people outside, but not, like,
8  specifically, you know, with me, so...
9  Q. Just patrons of the bar standing there?
10  A. Absolutely. They were still letting
11  people in, and so...
12  Q. Okay. Did you recognize any of those
13  people?
14  A. I can't remember. I don't think I was
15  even paying much attention to them.
16  Q. Okay. So if you would tell me what
17  happened when you first saw the first police
18  officers on the scene outside the iBar?
19  A. When I first saw the first police
20  officer, I believe he was talking to the owner,
21  Bart.
22  Q. And did you hear any of that
23  conversation?

ADVANTAGE REPORTING - (800) 347-3124

## Page 38

1  A. No.
2  Q. And this happened outside of the iBar?
3  A. Yes.
4  Q. Would you be able to describe for me
5  physically what that officer looked like?
6  A. No.
7  Q. Okay. And while you saw this officer
8  speaking with Bart, what else was happening, if
9  anything?
10  A. I can't be sure. Everything that was
11  happening that night just kind of happened back to
12  back, and I can't say that it -- at this point
13  that I was doing anything more than just trying to
14  be aware of the situation and seeing if they had
15  everything under control.
16  Q. Okay. Well, the other approximately two
17  police officers that you saw, did you see them do
18  anything while this one officer was speaking with
19  Bart? Were they speaking with other patrons or --
20  A. I believe they went inside.
21  Q. Now, those two that went inside, did you
22  ever see them come back outside that night?
23  A. Yes.

ADVANTAGE REPORTING - (800) 347-3124

## Page 39

1  Q. Apart from the three original police
2  officers that you saw, did you see other police
3  officers come on the scene at any point that
4  night?
5  A. Yes.
6  Q. Approximately how many other police
7  officers came to the scene?
8  A. I would say, if I remember,
9  approximately, it seemed, about around six or so.
10  Q. Is that six extra or six in total?
11  A. Six in total.
12  Q. Did you notice approximately how many
13  squad cars there were in the parking lot?
14  A. I can't recall. More than two.
15  Q. Did you have any conversations with any
16  of the police officers outside of the iBar on
17  April 2nd of 2011?
18  A. I don't think so. I don't think I did.
19  Q. Did you see whether -- strike that.
20     Did Ms. Gill have any conversations
21  with police officers outside the iBar on April 2nd
22  of 2011?
23  A. Yes.

ADVANTAGE REPORTING - (800) 347-3124

## Page 40

1  Q. Were you present in her general vicinity
2  when she had the conversation with the officer?
3  A. Yes.
4  Q. Now, was it one officer or more than one
5  officers that Ms. Gill was speaking with?
6  A. It was one officer.
7  Q. And would you be able to physically
8  describe that officer for me?
9  A. I remember he had dark or black hair,
10  Caucasian, male, approximately six feet, probably
11  about 200, 210.
12  Q. Were you -- strike that.
13     Was he in uniform?
14  A. Yes.
15  Q. Were all the officers that were on the
16  scene in uniform that you could tell?
17  A. Yes.
18  Q. Were you able to see his name tag or star
19  or anything like that?
20  A. I believe I saw his star. I don't
21  remember a name tag.
22  Q. Okay. Was there anybody else present
23  with Ms. Gill and you and this officer when

ADVANTAGE REPORTING - (800) 347-3124

### Page 41

1  Ms. Gill spoke with the officer?
2  **A. Her friend, yes.**
3  Q. And where were the four of you standing
4  in relation to the door of the iBar when Ms. Gill
5  spoke with the officer?
6  **A. Probably 20, 25 feet away from the front**
7  **door.**
8  Q. Did you observe Ms. Gill's friend's
9  attitude that night while Ms. Gill was speaking
10 with the officer? Her demeanor, did you observe
11 her demeanor at that time?
12 **A. Yes.**
13 Q. Were you paying attention to that?
14 **A. Yes.**
15 Q. Did she appear to be emotional and
16 agitated?
17 **A. Yes.**
18 Q. The way Ms. Gill described it for us is
19 the officer was asking her questions and her
20 friend would try to interject and other people
21 would try to tell the officer something. Is that
22 the way you remember it as well, or would you
23 describe it differently?

### Page 42

1  **A. No. That sounds about accurate. It just**
2  **seemed -- if I remember, the officer was here, and**
3  **then three of us were here. And then it seemed**
4  **like someone was asking him something else, and it**
5  **was kind of back and forth like that, so, yeah.**
6  Q. There were lots of people speaking at the
7  same time?
8  **A. Yes.**
9  Q. Did it appear chaotic?
10 **A. I wouldn't say chaotic. It was just a**
11 **lot of interruptions.**
12 Q. Did you hear the conversation between
13 Ms. Gill and the police officer?
14 **A. Somewhat, yes.**
15 Q. Tell me to the best of your ability what
16 the conversation consisted of?
17 **A. The officer asked her to describe what**
18 **happened.**
19 Q. And when he asked her to describe what
20 happened, what did she say?
21 **A. She told him what happened; and from that**
22 **point, if I remember correctly, he asked her to**
23 **describe to him in more detail what happened.**

### Page 43

1  Q. And did she do that?
2  **A. Yes.**
3  Q. Now, the first time when she told him
4  what happened, what did she tell him?
5  **A. Someone hit her in the bar.**
6  Q. Did she tell him where the individual hit
7  her, meaning where on her body?
8  **A. I believe so, yes.**
9  Q. And where was that?
10 **A. In the face area, particularly, like, I**
11 **believe, in the nose.**
12 Q. And when the officer asked her for more
13 detail, what sort of more detail was Ms. Gill able
14 to give him?
15 **A. I believe he was asking for more detail,**
16 **because of the interruptions, and maybe he wasn't**
17 **clear on what she was saying. I can't**
18 **specifically speak to, you know, a quote or**
19 **something that she said. I just kind -- I know**
20 **that's what he asked her, and then the**
21 **conversation kind of went from there.**
22 Q. Did she reiterate what she had told him
23 about how she was punched in the bar?

### Page 44

1  **A. Yes.**
2  Q. Okay. What was spoken with -- between
3  them after she reiterated what happened in the
4  bar?
5  **A. I don't remember actual words. I don't**
6  **remember actual conversation from that point at**
7  **all.**
8  Q. Were you trying to speak with that same
9  officer as well?
10 **A. No.**
11 Q. Was there anyone else in that general
12 vicinity with whom you were speaking?
13 **A. Tanya's friend was still there, yeah.**
14 Q. Okay. So you were speaking with her?
15 **A. No, I wasn't speaking with her either,**
16 **no.**
17 Q. Okay. I'm sorry, my question was was
18 there anyone you were speaking with in that area
19 while Ms. Gill was speaking with the police
20 officer?
21 **A. Yes.**
22 Q. Who were you speaking with?
23 **A. Bart, the owner.**

**Page 45**

1  Q. Was Bart outside the whole time during
2  Ms. Gill's interaction with this police officer?
3  A. I believe so, yes.
4  Q. And was he in that same general area
5  where you and Ms. Gill and the officer were
6  standing, or was he closer to the door?
7  A. No. He was in the same general vicinity.
8  Q. And, again, do you recall any specifics
9  of what was said between you and Bart at that time
10 while Ms. Gill was talking to the police officer?
11 A. No.
12 Q. At one point -- strike that.
13    Are you aware that at one point the
14 officer took Ms. Gill's hand, put it behind her
15 back, and walked her over to a car?
16 A. Yes.
17 Q. Okay. Did you see the officer take her
18 wrist, put it behind her back?
19 A. Yes.
20 Q. Do you recall what was spoken between
21 them, if anything, prior to the officer putting
22 Ms. Gill's wrist behind her back?
23 A. No.

**Page 46**

1  Q. Did you see any physical interaction
2  between Ms. Gill and the police officer before he
3  took her wrist and put it against her back?
4  A. I don't understand.
5  Q. Okay. Did you see any physical contact
6  between Ms. Gill and the police officer before he
7  took her wrist?
8  A. I don't remember. I don't think so,
9  though.
10 Q. For the, let's say, five to ten seconds
11 prior to the officer taking Ms. Gill's wrist, was
12 your attention focused on them or was it
13 elsewhere?
14 A. I would say most of my attention was in
15 that same vicinity, because if I remember
16 correctly, Bart was still right there as well. So
17 between talking to Bart and trying to make sure
18 that everything was okay with her, you know, I
19 can't say 100 percent, but, yeah, I was standing
20 right there.
21 Q. Was there anything specifically that
22 brought your attention specifically to the
23 officer's act of taking Ms. Gill's wrist?

**Page 47**

1  A. Outside of him grabbing her. I'm not
2  understanding that question.
3  Q. Okay. I just wanted to make sure that
4  your attention was on Ms. Gill and the officer
5  that moment before he took her wrist, or whether
6  your attention was brought to the two of them as
7  he was taking her wrist? Do you know what I mean?
8  A. Somewhat.
9  Q. Okay. Was the act of the officer taking
10 Ms. Gill's wrist to her back what brought your
11 attention to them, or had you been watching them
12 the instant prior to that?
13 A. I had been watching; and if I remember
14 correctly, where I was standing, they were to my
15 left, and I believe Bart was to my right somewhat
16 here. So I could -- you know, this whole vision
17 area I was able to see, you know. It wasn't -- I
18 didn't have my back to her if that's what you're
19 asking, no. I was facing her in that same general
20 direction.
21 Q. Okay. So, I'm sorry, I'm not trying to
22 make this a big deal. I just want to make sure
23 that your attention was on Ms. Gill and the police

**Page 48**

1  officer that moment before he took her wrist and
2  put it on her back, behind her back?
3  A. To my -- yeah, I believe so.
4  Q. Okay. Did the officer say anything to
5  Ms. Gill as he put her hand behind her back?
6  A. He said something, but I don't remember.
7  As a matter of fact, it didn't seem like it was --
8  what do I want to say? Whatever he said it was
9  either quickly or I couldn't hear it, you know.
10 But I do, like, remember him saying something as
11 he put her arm behind her back. I can't recall
12 what it was that he said.
13 Q. Did Ms. Gill say anything to him?
14 A. I believe so.
15 Q. And what did she say to him?
16 A. I can't -- I would be guessing.
17 Q. So you do not recall?
18 A. No.
19 Q. At that whole time that Ms. Gill was
20 interacting with the police officer outside the
21 iBar, was she still visually upset?
22 A. Yes.
23 Q. And when you say visually she was upset,

73

1 20, 30 feet outside the door?
2     A.   Yes, at times, yes.
3     Q.   All right. We've talked about the front
4 entrance of the iBar where people went in and out
5 and you described for us a little bit about the
6 layout east and west of the parking lot. Was
7 there another entrance to the bar that you were
8 aware of other than the front entrance that, say,
9 for instance, employees or other people would go
10 in and out of the bar?
11     A.   No. The front entrance, if this makes
12 any sense, if I can describe it, so she can -- the
13 front entrance, if there's a west door and you
14 come inside the west door, if you go a little east
15 in that same passageway, that would be the only
16 other way out. Meaning -- and I know I'm doing
17 descriptions, but, I'm sorry. You've got two
18 doors parallel to each other in the same hallway;
19 the west door, which is the door that's used, you
20 know, often, and then this door which I don't
21 think they even use it, but it's right there.
22 It's the same hallway. That's the only entrance/
23 exit that I'm aware of.

74

1     MR. HUNDLEY: Okay. Give me one second.
2 I'm sorry.
3     (Discussion off the record.)
4 BY MR. HUNDLEY:
5     Q.   I'm going to show you what has been
6 identified as camera 5 of the security cameras and
7 I'm just going to --
8     MS. RUKAVINA: I'm going to look over
9 your shoulder.
10 BY MR. HUNDLEY:
11     Q.   -- which is the video that I provided to
12 you earlier today, and I just have it paused at
13 23:46:04. And just looking at this still image,
14 can you orient yourself that this is a view of
15 that entrance into the iBar?
16     A.   Yes.
17     Q.   From what you're just telling me a moment
18 ago about there being two doors, is there a way
19 you can show us in relation to this image where
20 those doors are?
21     A.   Not really outside of saying directly
22 east of this door parallel, meaning it will be
23 right the same exact door, but on the other side

ADVANTAGE REPORTING - (800) 347-3124

75

1 of the same hallway. So when you enter right
2 here, to enter the actual lounge, you would make a
3 right; but if you were to go out of the door that
4 I'm speaking of, you would just keep walking about
5 ten feet and go east. So this is the west door.
6 There is a parallel door that looks exactly like
7 it, same hallway, east. So literally the doors
8 are like this and the entrance is in the middle.
9     Q.   I got you. So it's sort of like a
10 vestibule where you can enter and exit?
11     A.   Exactly. And the east door, I think I
12 seen it open once. They never use it.
13     Q.   The reason why I was asking is because
14 obviously there's only so much we can see from the
15 view of this part of the camera. And off to the
16 upper left of this image the parking lot continues
17 around to the left; is that correct?
18     A.   Uh-huh.
19     Q.   I just --
20     MS. RUKAVINA: Yes, just for the record.
21 BY THE WITNESS:
22     A.   I'm sorry. Yes.
23     MR. HUNDLEY: Thanks.

76

1 BY MR. HUNDLEY:
2     Q.   I just want to make sure that there
3 wasn't some sort of back entrance further around
4 to the left somewhere someone could enter this
5 area we're looking at without going through those
6 two doors you just described.
7     A.   No. Just this door.
8     Q.   Okay, all right. You told us earlier
9 about the noise level outside. Would it be fair
10 to say that even though everyone was in the same,
11 say, 20 or 30-foot circumference that because of
12 the noise you wouldn't be able to hear a
13 conversation with someone who is at the door, for
14 instance, while you were out where Tanya and the
15 officer was?
16     A.   Oh, very fair.
17     Q.   Yeah.
18     A.   Plus the regular outside noise right off
19 North Avenue, it's not -- you know, it's noisy,
20 period.
21     Q.   Okay. While you were outside, did you
22 ever hear anyone saying that they were sorry about
23 the incident, meaning someone that you didn't know

ADVANTAGE REPORTING - (800) 347-3124

77

1 that wasn't identified so far that you talked
2 about?
3    A.  No.
4    Q.  Okay. Again, going back to your
5 estimates about time, I want to make sure that I'm
6 not missing something, from looking at all this
7 video, it appears that there's a 15, maybe
8 20-minute time frame from when Tanya and her
9 friend enter the iBar to when this incident inside
10 the bar and then outside the bar takes place.
11    A.  Uh-huh.
12    Q.  Earlier you said you thought maybe it had
13 been an hour or two. If the video shows that it
14 was a significantly shorter time, is there
15 anything about that that you have a major quarrel
16 with?
17    A.  **No. Because honestly, being one of the**
18 **promoters of the party there, I wasn't in one**
19 **place, and, of course, not really focused on time.**
20 **So it would have shocked me if you had said, you**
21 **know, a short -- a lot shorter of a time. But**
22 **that time frame doesn't shock me.**
23    Q.  Okay, all right. You mentioned earlier

ADVANTAGE REPORTING - (800) 347-3124

78

1 you had a few conversations with Bart inside the
2 bar and then during this interaction with the
3 police outside the bar. Did you ever hear him
4 stating to anyone, including the police, something
5 to the effect of nothing happened, meaning that
6 there wasn't any kind of incident inside the bar
7 between Tanya and this other patron?
8    A.  **No, I can't say that I remember that.**
9    Q.  Okay. And did you ever get the
10 impression that Bart or any of the iBar employees
11 were trying to convey the message to the police
12 officers that there hadn't been any sort of
13 incident inside the bar?
14    A.  Yes.
15    Q.  Tell me a little bit more about what you
16 observed or what your impressions were there?
17    A.  **Like I said, not being able to repeat a**
18 **conversation, but I saw Bart's interaction with**
19 **the police. And knowing that him being a lounge**
20 **owner, not wanting it to be an incident. So, you**
21 **know, I would be safe in assuming that he was**
22 **trying to keep down whatever incident happened.**
23    Q.  Okay. And you've said basically what I

ADVANTAGE REPORTING - (800) 347-3124

79

1 was going to follow up with. Your exposure, to
2 whatever degree it is, to promotions at this bar
3 or elsewhere, you obviously know that a bar owner
4 tries to have as few interactions with the police
5 as possible; is that fair to say?
6    A.  Yes.
7      MS. RUKAVINA: Objection, speculation.
8 BY MR. HUNDLEY:
9    Q.  After the incident outside when Tanya
10 left and you went back inside, was there ever an
11 occasion later on that evening where you saw any
12 security video of the time of this incident?
13    A.  No.
14    Q.  Did anyone ever comment to you that night
15 or any -- at any other time of having seen
16 anything on the security video that the bar had?
17    A.  **I don't remember that, no.**
18    Q.  Okay. Throughout your observation
19 between Tanya Gill and the police officers outside
20 the iBar, did you get the impression that they
21 took her complaint about being struck inside the
22 iBar?
23      MS. RUKAVINA: I'm sorry, can you repeat

ADVANTAGE REPORTING - (800) 347-3124

80

1 that, or read that back I should say.
2      (Whereupon, the question was read.)
3 BY THE WITNESS:
4    A.  Yes.
5 BY MR. HUNDLEY:
6    Q.  Okay. In other words, from what you
7 overheard, it seemed to be Tanya's intent to let
8 the police officers know that she had been struck
9 while inside the bar, correct?
10    A.  Yes.
11    Q.  Okay. Have you ever had any experience
12 prior to this incident of making a complaint or
13 reporting an incident to the police?
14    A.  **I don't understand the question.**
15    Q.  In other words, whether on the scene of
16 some incident or having to go to a police station,
17 have you yourself had to make a police report
18 about some incident taking place?
19    A.  **Maybe like an accident or something. Is**
20 **that what you're asking?**
21    Q.  Sure.
22    A.  **Yes, I've done that before.**
23    Q.  Sometimes something gets stolen and

ADVANTAGE REPORTING - (800) 347-3124

85

1  A. Based on what happened, I would say yes.
2  Q. I know you told us earlier that you don't
3  recall the specifics of what a lot of people said
4  even though you know that they were having
5  conversations, and I certainly appreciate that.
6  From the moment that the one officer twisted
7  Tanya's wrist behind her back and pushed her up
8  against the car until the point that she was
9  released, I think you said that was approximately
10 ten seconds later, did you hear any of the other
11 police officers say anything along the lines of
12 let her go or encouraging him to stop having her
13 in that hold?
14 A. No, I didn't hear that.
15 Q. Okay. Throughout your observation of
16 this incident between Tanya Gill and the police
17 officers, did she do anything that you felt was
18 disrespectful to the police officers?
19     MS. RUKAVINA: Objection, form,
20 foundation, speculation.
21 BY THE WITNESS:
22 A. No.
23

86

1  BY MR. HUNDLEY:
2  Q. And during and following the physical
3  contact between the police officer and Tanya Gill,
4  meaning having her arm behind her back and against
5  the car, did Tanya do or say anything that in your
6  opinion was disrespectful toward the police
7  officer?
8      MS. RUKAVINA: Same objections.
9  BY THE WITNESS:
10 A. No, I don't remember anything like that.
11     MR. HUNDLEY: Okay. Just give me one
12 second. I'm trying to cue up the video to the
13 correct point.
14     Let me see if I can do this in a way
15 you both can look at.
16     MS. RUKAVINA: I can come around.
17 BY MR. HUNDLEY:
18 Q. I'm showing you this same video we saw
19 earlier, which I suppose for identification
20 purposes we can call Dixon Exhibit No. 1.
21     (Document marked as Dixon Deposition
22     Exhibit No. 1 for identification.)
23

87

1  BY MR. HUNDLEY:
2  Q. And I have it paused at the time marked
3  23:46:01. And to make matters worse, this version
4  of the video has the time stamp in the upper
5  left-hand corner. You can see that, right?
6  A. Yes.
7  Q. Okay. Which is going to make things even
8  harder, because that's approximately where this
9  activity takes place, I believe.
10     I'm going to let the video roll for
11 just a moment, because I believe this is when you
12 walk outside, and you can let me know.
13     All right. I'm pausing it at
14 23:46:21. Is that you in the light-colored shirt
15 that just walked out?
16 A. Yes.
17 Q. Okay. Let it run for just one more
18 second.
19     At 23:46:34, some additional
20 officers walk out, correct?
21 A. Yes.
22 Q. And before that, there was an officer who
23 is sort of facing the camera who appears to have a

88

1  buzz cut or perhaps was partially bald; is that
2  right?
3  A. Yes.
4  Q. As you sit here today -- well, strike
5  that.
6      In a moment, the activity is going
7  to get even further in the corner of this image.
8  But as you look at these officers here, can you
9  identify any of them as being the one that
10 eventually had physical contact with Tanya Gill?
11 A. From this picture?
12 Q. Yes.
13 A. It may have been this gentleman here.
14 Q. Okay.
15 A. It was not him for sure.
16 Q. Not the bald one?
17 A. Right.
18 Q. But perhaps this one who is just --
19 A. Yeah. The video is grainy, so I can't
20 see like that to be able to identify it.
21 Q. Okay. I know there's definitely a
22 limitation to the quality of the image,
23 unfortunately.